LAMSON CO. v. STANDARD STORE SERVICE, Inc.

(District Court, D. Massachusetts. February 21, 1916.)

No. 483.

1. PATENTS ☞328—VALIDITY AND INFRINGEMENT—CABLE CARRIER APPARATUS.
The Amsden patent, No. 960,617, for cable carrier apparatus, discloses invention and covers a meritorious improvement, but not a pioneer invention; also *held* valid as against the claim of public use more than two years prior to the application, but, as limited by the prior art, not infringed.

2. PATENTS ☞328—VALIDITY AND INFRINGEMENT—LOCKING DEVICE FOR CARRIERS.
The Amsden patent, No. 1,071,018, for a locking device for cable carriers, *held* valid, but limited to the particular construction of the device shown and described; also *held* infringed.

In Equity. Suit by the Lamson Company against the Standard Store Service, Incorporated. On final hearing. Decree for complainant in part, and for defendant in part.

Charles P. Hidden and Benjamin Phillips, both of Boston, Mass., for plaintiff.

Emery, Booth, Janney & Varney, of Boston, Mass. (Frederick L. Emery and Louis A. Jones, both of Boston, Mass., of counsel), for defendant.

DODGE, Circuit Judge. The plaintiff owns United States patent 960,617, issued to it June 7, 1910, as assignee of George A. Amsden, for cable carrier apparatus, and United States patent 1,071,018, issued August 26, 1913, also to it as Amsden's assignee, for locking device for carriers. The first patent has 18 claims, the second 15. The defendant has made and sold apparatus described in United States patent 1,055,258, issued March 4, 1913, to Louis W. Chism, assignor to Walsh Store Service, Incorporated, for cable carrier apparatus. The plaintiff says that such apparatus infringes claims 3, 7, 8, and 11 of the first Amsden patent (960,617), and that certain carriers made and sold by the defendant infringe all the claims of the second Amsden patent (1,071,018).

[1] 1. As to the first Amsden patent, the defendant contends that it is invalid by reason of an alleged public use more than two years before Amsden filed his application on August 25, 1905. If this defense cannot prevail, the defendant insists that the four claims sued on cannot be so construed as to cover the apparatus which it makes and sells under the Chism patent, No. 1,055,258. From the patent itself and the four claims sued on are obtained the following indications of the nature of the questions thus raised:

This patent states that "its principal object is to provide means whereby a carrier or box may be utilized running 'upon its side'"; also that another object is "to provide drop line receiving and dispatching way stations for high line apparatus, and also improved switching devices for diverting the carrier from the main line to

said stations." For "other important features" of the invention reference is made to the description and claims.

The first three claims sued on cover specified features "in a cable carrier apparatus." Claim 3 specified:

(1) A track or way.
(2) A carrier adapted to travel upon its side on said track or way.
(3) An endless motor cable adapted to propel said carrier along said track or way.
(4) A drop loop or depression in said track or way forming a drop or way station.
(5) Means in said drop station for placing said carrier in co-operation with said track or way.
(6) Automatic means for engaging said carrier with said cable.

Claim 7 specifies:

(1) A track or way.
(2) Carriers adapted to travel upon their sides along said track or way.
(3) A motor cable adapted to propel said carriers along said track or way.
(4) A plurality of drop stations located along said track or way.
(5) Means for sending or receiving said carriers to or from any of said drop stations.

It is to be noticed that the above two claims, 3 and 7, are the only ones sued on which specify the carrier running upon its side, to utilize which was stated to be the principal object of the invention. The other two claims sued on, as will be seen, purport to cover, with the other elements specified, all carriers, whether running on their sides or not.

Claim 8 specifies:

(1) A track or way.
(2) A carrier adapted to travel on said track or way.
(3) An endless motor cable adapted to propel said carrier along said track or way.
(4) A drop loop or depression in said track or way forming a drop or way station.
(5) Means in said drop station for placing said carrier in co-operation with said track or way.
(6) Automatic means for engaging said carrier with said cable.

Claim 11, the last of the four sued on, covers, "in a cable carrier apparatus," the following described combination:

"The combination with (1) a central station, of
"(2) A sending and receiving track or way;
"(3) Carriers adapted to travel on said track or way;
"(4) An endless motor cable adapted to propel said carriers along said track or way;
"(5) An independent drop receiving track or way station;
"(6) Means for diverting said carriers from said sending track or way into said receiving track or way station;
"(7) A drop loop on said receiving track;
"(8) Means in said drop loop for returning said carriers to said central station."

It will be noticed that the "drop loop or depression" on the track or way, "forming a drop or way station" (claims 3 and 8), the "plurality of drop stations located along" the track or way (claim 7), or the "independent drop receiving track or way station," with the

"drop loop on said receiving track" (claim 11), refer to a feature common to all the four claims sued on, which, with its co-operating switching devices, constitutes the means for securing the second and less important of the two objects which the patentee sought to secure in his apparatus, according to his own statement above quoted. It is this drop station feature only which is important for the purposes of the case. As to the limitation in claims 3 and 7 that the carriers are to travel on their sides, notwithstanding the importance claimed for it in the patent, as above, the plaintiff's brief has treated it (pages 12, 16) as unnecessary in view of the prior art, and immaterial in the present controversy.

For the purposes of this suit, the plaintiff insists upon the drop station of the Amsden apparatus as its distinguishing and important feature. The claim is made that:

"Amsden was the first to produce a high-line cable system having completed drop stations; that is, stations located at a low level and connected by track sections with the high line at the high level, and provided with means not only for receiving carriers at the low level from the cashier's desk, but also for dispatching carriers from the low level to the cashier's desk."

And it is contended that this was a "pioneer invention," and Amsden's patent a "pioneer patent."

.There is no dispute that in establishments using cash-carrier apparatus, what is known as the "high-line" type of apparatus has proved its superiority over and has generally superseded what is known as the "low-line" type, which preceded it, and was the type at first adopted for installations of such apparatus. The advantages of keeping as much as possible of the track and cable upon which the carrier boxes are to travel near the ceiling, where it will be out of the way of people on the floor, are obvious and undisputed. But means for getting the carrier boxes up and down, from and to the points nearer the floor from which they are to be sent, and at which they are to be received, are essential, and the plaintiff contends that Amsden's were the first commercially successful means.

Before Amsden's application there had been high-line installations wherein the carriers had been lifted in elevators or hoisting devices operated by the sender to the overhead level of conveying tracks and cable, and there held until so engaged with such tracks and cable as to be carried along by them at that level to the central station or cashier's desk. From that point they were returned to the sending point by there re-engaging them with the tracks and cable, which would then take them along the circuit until disengaged and switched from the conveying track to a descending section of track ending at the sending point, down which section their own weight would carry them.

In Amsden's first patent, elevators or hoisting devices, distinct from the main tracks and cable, are dispensed with by carrying both tracks and cable, at each station for sending and receiving, downward from their normal level, around a short curve at the station level and upward again to the normal level, thereby forming with them what the patent calls "drop loops." Suitably arranged pulley wheels,

around which the moving endless cable passes, enable it to follow the tracks in their downward and upward course around the drop loop, without losing that, relation with them which enables it to continue the movements along them of carriers engaged with it. Outward going carriers from the central station, destined to a given sending and receiving low-level station, are, by the operation of selecting and switching devices, not now requiring description in detail, there transferred from the main track to an independent section of downwardly extending receiving track, down which they slide, released from the main cable, to its terminus adjacent to the bottom of the loop for that station in the inward-bound track, at which terminus there are arrangements permitting their removal. Re-engaged with the main track and cable at a convenient point near the bottom of said loop, the inward-bound movement of said cable takes them along said track to the top of said loop and back to the central station. On their way thither they pass downward and up again around all the intervening loops in said track.

Installations of Amsden apparatus, comprising about 8,500 drop loop stations of this kind in all, have been made by the plaintiff since 1904 or 1905. The degree of commercial success thus indicated tends to establish the plaintiff's claim that the above method of arranging high-line apparatus was distinctly superior to the types of high-line apparatus which had preceded it; nor is this tendency materially lessened by the fact that the plaintiff has recently modified the patented structure above described, in apparatus installed by it comprising in all about 700 drop loop stations, so as to permit carriers moving toward the central station to cross over the top of each intervening drop loop upon continuous high-level track, instead of having to travel around all drop loops between the central station and the particular drop loop station from which they have been dispatched. As will appear, this modification approaches the defendant's structure more nearly in some respects then does the construction which the patent describes.

The defendant's claim that the sale or public use of apparatus including drop loop stations, such as Amsden describes and claims, for more than two years before his application, has been proved by the evidence heard, may here be considered.

There is no question that in 1903 Amsden himself, then employed by the plaintiff's predecessor in the same business, superintended an installation of cash carrier apparatus in a large department store in Minneapolis, belonging to Donaldson & Co. It is undisputed that a considerable, but not the larger, portion of the apparatus installed was of a high-line type, including five special drop stations, and when completed embodied the above-considered invention of Amsden's subsequent patent, save for a possible difference in cross-section of the tracks used, which I consider immaterial. If this portion of said apparatus had been sold or was in "public use" before August 25, 1903, the invention in question was not patentable after that date, and the Amsden patent for it is without validity.

Although that portion of the installation which embodied Amsden's

invention, as above, was a considerable and an important portion, it was not the larger portion, and the apparatus was, for the most part, of the low-line type. Three contracts, dated April 28, May 5, and June 15, 1903, respectively, covered the entire installation as at first planned, and according to them it was all to be of the low-line type. But a still later contract, dated June 29, 1903, provided for the substitution of the five special drop stations, instead of five low-line stations called for by the earlier contracts. All these contracts were between the Donaldson Company and the plaintiff's predecessor, the Martin Cash Carrier Company. Amsden acted for the Martin Company in making the contracts, besides superintending the installation made in pursuance of them. The five drop stations referred to constituted the first apparatus anywhere erected embodying the invention of his first patent, and until this part of the apparatus was not only set up complete, but in actual use for its intended purposes, there was no saying positively that the invention was capable of practical commercial use.

A bill dated September 12, 1903, was rendered for the greater part of the work, including that done in erecting the five drop stations, and this bill was subsequently paid. The Donaldson store was reopened to the public, the installation as a whole being then practically complete, on Monday, August 31, 1903. Unless public use of that part of its cash carrier system which included the five drop stations began at an earlier date, no anticipation is shown. Three of the drop stations were in what was known as the "book department," and there is testimony that the "book department" was in working order and open to the public on Monday, August 17, 1903. If this is proved to be true, and if the drop stations in that department were also in regular use and operation from and after August 17th, public use of them for eight days preceding August 25, 1903, is shown.

The witnesses who undertake to fix the date of the opening of the "book department" as August 17th are the Donaldson Company's secretary and treasurer, its former chief engineer, and an electrical contractor employed by the Martin Company in the work referred to. Their depositions were taken in Minneapolis in January, 1915, more than 11 years after the dates they undertake to fix. Only one of them could assist his memory by any memoranda made in 1903, and such as he used for that purpose were insufficient of themselves to establish the dates in question, though serving as the basis for deductions which the witness sought to draw from them and from his memory as to the order of events.

Amsden himself, on the other hand, testifying 6 months later, at the hearing before me, and basing his recollection on memoranda he says he made at the time, states that the portion of the system installed which included the five drop stations remained still incomplete on September 3, 1903, and that none of those stations were in operation before that date.

The burden is on the defendant to show public use before August 25, 1903, the result of the evidence is that it could have begun only a few days at most before that date, and I find the evidence as a whole, con-

sidering the extent to which it depends upon mere memory after a long term of years, insufficient to produce that clear conviction necessary to justify a finding that it actually did begin before the date named. That the apparatus belonging to the five drop stations was not sold to the Donaldson Company before the bill covering it was paid would seem, in any event, the only conclusion possible on the evidence. I find nothing to show a complete sale at any earlier time. For the purposes of this case, Amsden's first patent is therefore regarded as valid.

The remaining question is whether it is infringed by the defendant's apparatus, made under the Chism patent. In one respect this apparatus is better entitled than Amsden's to be called a "high-line" cable system, viz.: Its main track, or way, and its endless cable, adapted to propel the carriers moving on said track or way, are kept at a continuously high level throughout their entire length; no part either of the main track or way, or of the main cable, being carried downward and up again through any "drop loop" like Amsden's. If there are at the low level sending and receiving stations, which can be said to answer to Amsden's "drop station," it has no construction formed in and by the main track, like Amsden's, but is composed of two independent auxiliary sections of track, one for receiving at, the other for sending from, the particular station. Removal of either section from the apparatus would leave unaffected the operation of the main track or main cable. The defendant's receiving sections are, for all purposes here material, like those of Amsden in arrangement and operation. Considered by themselves, neither the defendant's nor Amsden's receiving means differ in any respect here material from what was known and used before Amsden. Closely adjacent to the terminus of the defendant's receiving section is the lower end of its independent sending section of track, in engagement wherewith carriers may be there placed for return to the central station. So engaged, they are lifted thereon vertically to the level of the main track and cable, at that level automatically switched from the sending to the main track, and connected with the main cable, which then takes them along the main track to their destination. They are so lifted upon and along the sending track, until so connected with the main track and cable, by a separate auxiliary endless cable employed at each low-level station for that purpose only; each of such auxiliary cables being independent of the main cable, except that friction pulleys in engagement with the main cable, and thus kept in rotation by its movement, keep in motion the friction pulleys around which each auxiliary cable passes at its station and which keep it there in motion.

The significant feature of difference between the defendant's apparatus and Amsden's thus consists in the different means employed at each low-level station for returning carriers to the central station. Instead of employing the main track and cable to lift the carriers from the way station level to the high level, as does Amsden, bringing them for that purpose down to the station level and immediately back again, the defendant uses for the same purpose an independent local track and a local cable, independent of the main cable, except that the motion of both is produced by the same source of power, by which arrangement

the defendant avoids making' with its main track and cable the curves and circuit involved in Amsden's drop loops.

In view of this difference there is difficulty in making the terms of any of the claims in suit fit the defendant's mechanism. In claim 3, the feature or element (4) in the above analysis is "a drop loop or depression in said track or way forming a drop or way station"; and the same is true of claim 8. No other than the main track or way can be the track or way meant in either claim, nor can the "drop station" in either be regarded as formed otherwise than by the "drop loop or depression" in that track or way, which both specify. In claim 7, unless the "drop stations located along said track or way" referred to in the feature or element (4) thereof are drop stations formed as specified in claims 3 and 8, the claim is too broad, because it would include the stations of the prior art from which carriers were lifted to track and cable at an overhead level by means of elevators or hoisting devices operated by the sender. In claim 11, element (7) specifies "a drop loop on said receiving track." If this means the "receiving track" of (5) and (6) in the same claim, the defendant's independent receiving section of track at each way station has no drop loop in it; and if it refers to the track whereon carriers are returned to the central station, the defendant's return track, as has been stated, is without any loops.

A construction of these claims, such as is necessary for the purpose of holding them infringed by the defendant's apparatus, does not seem to me justified, unless the above contention by the plaintiff is established, that Amsden's invention provided the first complete drop stations in high-line apparatus, and is therefore to be treated as a pioneer invention.

One statement of the grounds upon which the plaintiff relies in support of this contention, and of the extent to which it claims a pioneer character for Amsden's invention, has been quoted above. What is meant by a "complete drop station" appears from that statement to be a low-level station "connected by track sections" with the high-level line, and provided at its low level both with receiving and with dispatching means.

That there was high-line apparatus before Amsden, having low-level stations provided at that level both with receiving and with dispatching means, cannot be denied. In such stations so provided, the receiving means employed a track section connecting the high line with the station. Dispatching means provided at such stations, however, instead of employing track sections connecting the station with the high line over which carriers could run as on the main track, had elevating mechanism for lifting the carriers to the main track, and although their ascent was direct and controlled by guideways, these can hardly be called track sections in the sense here intended. Apparatus of the above kind is described in the patents to Cowley, No. 474,040 (1892), and to Martin, No. 539,127 (1895), relied on by the defendant.

Amsden's loops in his return track provided his low-level stations with track connection from the station to the high line, over which carriers can be sent upward by the same power which moves them

horizontally on the high line itself, instead of the previously used mechanism otherwise operated for hoisting them to the connection with the high line. But in doing this, he cannot be said to have availed himself of an idea wholly new with him. The older low-line apparatus is shown to have afforded not infrequent instances of adaptation to particular circumstances involving carrying the main track and cable upward from a station to an overhead level, though followed by a return to the lower level. And in the later high-line apparatus before Amsden there are shown to have been instances wherein the return track and cable were brought downward from the high level to reach a given station, and from it were carried back again to the high level.

Amsden's patent, therefore, cannot fairly be said to cover either a function never performed before, or a wholly new device, or a device of such novelty and importance as will distinguish it from a mere improvement upon what preceded it. Drop loops were not wholly new with him; it is only in his adaptation of them to provide better dispatching means at each low-level station than were afforded by the station equipment of prior apparatus, that his novelty consists. It was no doubt a meritorious improvement, but I cannot, on the evidence, regard it as so new or so important as to justify making his claims cover the provision of dispatching means at low-level stations not employing drop loops at all and operating upon principles differing so widely from his as do those provided in the defendant's apparatus.

It is to be noticed that there is no claim in Amsden's patent of any such importance for his "drop-line receiving and dispatching way stations," as has been claimed for them in the present controversy. They appear in his patent as subordinate in importance to the use of carriers running on their sides, and as of no greater importance than the improved switching devices therein described, with neither of which improvements are we here concerned. Nor has the plaintiff's evidence shown the commercial success of Amsden's apparatus as a whole to have been due in any greater proportion to the dispatching means provided for his drop stations than to its other new and improved features.

It is further to be noticed that the specification of the patent contains no indication whatever that the drop stations mentioned in the claims may be different in any respect from the "drop-line stations," to provide which is one declared object of the patent, or that they may be formed otherwise than by looping down the main track and cable—i. e., the "line"—as the patent specifies. The proceedings in the Patent Office upon Amsden's application, as it seems to me, further enforce the conclusion that drop stations of any other kind were not within the applicant's contemplation.

It was said on the plaintiff's behalf, in argument, that the differences between the defendant's apparatus and the apparatus of the patent are, in the respects here important, merely colorable differences, not material as regards use and operation. With this view I find myself unable to agree. The defendant's independent section of dispatching track and separate local cable differ in their method of operation too widely from the dispatching portion of Amsden's loops. By dispensing with the latter, the defendant foregoes advantages which they possess and

avoids disadvantages which they involve. That on the whole the defendant's dispatching means are improvements over Amsden's seems hardly disputed. My conclusion must be that no infringement of any of the claims in suit is proved.

[2] 2. As to Amsden's second patent, No. 1,071,018, it relates only to a locking device said to be especially adapted for use in carriers such as are used in cable carrier apparatus. The object of the invention is declared to be:

"To supply a simple and effective locking device which will positively lock the cover of the carrier closed and prevent the accidental opening of the same when rounding the turn or in transit."

That the alleged infringing carrier, Plaintiff's Exhibit H, infringes the claims of this patent, if the patent is valid, the defendant does not dispute; but it contends that the device of the patent differs from prior devices only in details, not new with Amsden, in the selection and use whereof nothing beyond mechanical skill and judgment were involved.

The defendant had no actual notice of this patent until the present suit was brought, September 27, 1913, one month after the patent had been issued. The plaintiff had omitted to mark the carriers it made under it according to Rev. St. § 4900 (Comp. St. 1913, § 9446). Immediately upon the bringing of the suit, the defendant, under advice of counsel, stopped making and selling carriers like Exhibit H, and substituted carriers of a different construction, which are not before the court in this case. Although the carriers like Exhibit H, for which the defendant could be required to account, would seem to be, of necessity, very few in number, the plaintiff's right to a decree in respect of them is established unless the defendant has shown that, as it contends, the patent covering them does not describe an invention having patentable novelty.

The locking device, as therein described, is for use on carriers having lids or covers thrown and held open by a spring. In a circular depression in the face of the cover is pivoted a lock lever having one end upturned for use as a handle, while the other end forms a latch adapted to engage under a lip or projection made by indenting a portion of the side wall; the cover being cut away so as to let it pass said lip or projection in closing and opening. Pressure on the upturned end or handle in one direction, the cover being closed, swings the lever so as to bring the latch at its other end underneath the lip or projection and thereby hold the cover closed. Pressure in the opposite direction swings the lever so as to withdraw the latch from beneath the projection and let the cover fly open.

A stud on the underside of the lever, between its pivot and the upturned handle end, passing through a suitably curved slot in the cover, limits the movement of the lever in each direction. A flat spring secured to the inside of the cover has a rib or projection so located as to engage one side or the other of the stud, which, while permitting the stud to ride over it during the movement of the lever from one end to the other of the slot, holds the lever, when in position at either end, against accidental displacement.

Among a number of prior patents to which it refers, the defendant

238 F.—14

relies mainly on those to Martin, Nos. 331,418 and 368,219 (1885), to Wotruba, No. 394,320 (1888), and to Upp et al., No. 860,947 (1907). These references show, if it is not sufficiently obvious without them, that none except old and familiar features are found in the patented device. The defendant's contention that, combined as in the patent, they have no new function or mode of operation, and that Amsden has added nothing to former devices in which they may be found, save in the way of mechanical detail, seems to me of considerable force. But in view of all the evidence, including that as to the commercial success of the patented carriers, I am not clear that patentable invention is wholly wanting in Amsden's adaptation of the component features to the special requirements of a cash carrier for use with apparatus of the kinds here involved. It seems to me certain, however, that the invention is necessarily so limited in its scope as to require its restriction to the particular construction shown and described. Exhibit H is held to infringe because it exactly corresponds to that construction. Of the 15 claims of the patent, it may be said generally that they are drawn with the obvious purpose of covering as much as possible beyond the particular construction referred to. I hold the claims valid to the extent only that they cover that construction, and infringed by Exhibit H only because it embodies that construction. The terms of the decree to be entered will restrict its application to carriers embodying the same construction.

A decree may be entered, dismissing the bill as to the first of the two patents sued on. As to the second patent, it will provide for an injunction and for an account within the limits indicated.